Good morning, Your Honors. I'm Carl Gunn. I represent Ms. Webster. I'm going to try to reserve two minutes for rebuttal, and I'll try to keep track of my time. The real concern here is that Ms. Webster could have been convicted without the jury unanimity that's one of the fundamental parts of the Sixth Amendment. It's certainly possible that all the jurors agreed she took money each of the three times the government claims. But it's also possible, given the instructions, that some jurors thought she took money the first time, some jurors thought she took money the second time, and some jurors thought she took money the third time. It could have been... CINDY Counselor, do you think that really matters in this case where it looks like a continuous plan to rip off the bank? CARL GUNN I think it does, Your Honor, because I don't think it necessarily looks like a continuous plan to rip off the bank, and there certainly wasn't any allegation in the indictment of that element or any instruction requesting it. I think the evidence here, frankly, just look at the evidence, is equally consistent with Ms. Webster, assuming she took the money any of the times, that she thought to herself as she was working one day, gee, I'm going to try and take some money and see if this works, and she took it. And then later on, she thought, gee, that seemed easy, maybe I'll try it a second time, and she took it. And then she tried it a third time because it was easy the second time. And that would, I think, clearly be, under any circuit's version of the law, three separate takings and three separate thefts. And I think the evidence, I mean, there's nothing in the evidence, it seems to me, that shows one way or the other whether it was the version I just suggested or a version like Your Honor suggested where there was some plan at the beginning of the second day or the beginning of the first day that I'm going to take $70,000 and several steps over the next. But it's the sort, the one thing that seems to come out from the video is this, you know, fairly careful organization of how to do this each time that seems to make it more like a plan. I mean, it just, in terms of, are we here on plain error review on this? I think we're here on harmless error review. Harmless error, okay. Because I think it was the government's, if they're going to go on this preexisting common plan theory, I think it's the government's obligation to first allege that in the indictment, which I don't think they did, and second, ask for an instruction if that's their theory. But Your Honor, let me address that point, though, because I don't, first of all, I think there is some debate about whether it was exactly the same sort of organization each time. We went back and forth, I think, in closing arguments about what the videotape really showed. For example, I think, my opinion and what matters, I think an argument could strongly be made that at least the second time there wasn't any sorting of money, for example, going on, which is one of the big points they make about the way it was done the same each time. Now, I'm not sure the government actually argued differently on that. I think Ms. Rivera, the bank investigator, basically admitted that. Maybe the government could argue different, but I think it could be argued differently. Second of all, Your Honor, I don't think using a same modus operandi, so to speak, means there's a preconceived plan each time. It's equally, you do it one way the first time, it works. When you decide a second time to do it later on, you're probably going to do it the same way that worked. Just like when you rob a bank, you're probably going to rob a bank each way, the same way each three times, but it doesn't mean you're planning all three bank robberies at the same time. So I don't think the fact of a similar modus operandi really goes at all strongly to the idea of some preexisting common intent at the beginning about all three takings. How do you think the jury instruction should have read? Well, the jury instruction I think that should have been given is the specific unanimity instruction I requested, which was that the jurors had to agree on one of the three takings the government was arguing took place. They had to be unanimous as to at least one of those three takings. If you're going to say that the government could argue this common preexisting intent type of theory, I would have opposed that because I don't believe it was sufficiently alleged in the indictment. But if the government was going to be allowed to do that, I think the instruction needed to track something similar to the language in the Billingsley case, if it was going to be allowed. And Billingsley talks about, I believe I quoted in my reply brief, let's see, something like what I quote in my reply brief at page three. A plan or scheme or setting up of a mechanism which when put into operation will result in the taking or diversion of sums of money on a recurring basis prior to or at the time of the first taking. That's the language that if you believe Billingsley states the law of this circuit, I think would have to be expressed in an instruction. Now I note in a footnote in my reply brief that it's not crystal clear to me that in the Ninth Circuit even that is allowed as a way to aggregate takings. But I don't think this Court needs to reach that because it wasn't a theory which the requested an instruction in this case. Well, and what if the evidence from the video is so clear that there's no doubt that there was theft on each of these three? And I understand Your Honors looked at the video yesterday, so. Well, because as you appreciate, those still photos are almost useless. Right. And I believe the videotape is far from clear enough. Okay. Tell me why that is. Well, let me explain. First of all, I think it's a sort of weird application of harmless error for Your Honors to be having to do, frankly, because it's not like just putting together inferences and deciding what inferences can be drawn from the evidence. You're actually sort of looking at the evidence and making your own judgment. Now if you saw something like this, then I think probably harmless error would exist. But you have to remember when you're looking at that videotape that what you're really you see, or not even what you're pretty sure you see, or not even what you are convinced beyond a reasonable doubt you see, or not even what all three of you are convinced beyond a reasonable doubt what you see, is whether you can say beyond a reasonable doubt that no reasonable juror could have a reasonable doubt about what they saw in the videotape. But why is that any different than when a judge reads a transcript, looks at the pictures of the gun, and all of that on appeal, and we put it together, and then we ask ourselves the same question? It's a little, I'm not saying you can't do this at all. I agree that if you saw me do this on a videotape, that would, but you have to be a little more careful. What if I saw you do this? What happened here? But it's what you see, remember. What you see is you see some envelopes go down, and you see some fiddling here, but then you see some envelopes, but you see some envelopes come up, and you never actually see any envelopes go in the shirt. And I would submit you can't tell beyond a reasonable doubt that the number of envelopes that comes up is different than the number of envelopes that goes down. Counsel, if one of the things on the video was absolutely clear so that no reasonable juror could think that there was not theft and a concealment at that time, is that enough? I think probably it is, Your Honor. If it's absolutely clear, if it's such that Your Honors can say beyond a reasonable doubt that no reasonable juror could have a reasonable doubt. Can I say one of them? I'm sorry? Yes. I think probably. Don't you have to combine that, too, with, I mean, it has to be more than $1,000, correct? Yes. And then so we have this other evidence that money is missing, correct, from the bank? Right. But there's evidence that on some occasions almost that much money was missing just because of an error in the processing. Remember? Right. There were bank records that showed on one occasion there was $66,000 missing that wasn't due to a theft. I'm sure none of us got a lot of comfort out of watching how banks process our deposits. It was much less automated than one might think. It makes one not want to be dealing in that sort of cash with banks, I guess. Right. Go ahead. Just to get back. So you would think some instruction along the line of with all of you agreeing that on a particular occasion the plaintiff took more than $1,000 would have cured the problem? Yes. And I think in the context of the circumstances of this case where the only argument was about three specific times, points, that you might have made the instruction more specific to say on one of the three points the government's argued. So in theory it could be some other point, I suppose. Out of curiosity, was there an argument about loss at the sentencing hearing? Yes, there was. And the judge found actually, I didn't try to argue for less than $30,000, which would have been the next step down under the guideline. I did convince Judge Tagasugi that it was under $70,000. And between $30,000 and $70,000 doesn't matter, so there was no argument about that. So at least Judge Tagasugi, using a preponderance of the evidence standard, found some doubt at least about the amount. That's, of course, the amount for purposes of conviction is only $1,000, of course. All right. I'll save the remainder of my time. Good morning. May it please the Court, Anthony Montero for the United States. The district court in this case did not abuse its discretion in denying the unanimity instruction, and that is the issue before this Court. The government properly aggregated defendants' three takings into one theft. And if you look at the factors that are set forth in Billingsley, Parisian, and Papia, the government believes that those factors all justify that aggregation was proper in this case. Would it be all right if the jurors, back in the jury room, one juror said, you know, I think on that first occasion she took money, and another juror says, no, I don't think so, but I think she took it the first or second time, but she did the third time. Yes. That would be okay? That would be okay, and that is otherwise aggregation is, once you accept that aggregation is permissible, that is the result that you have to accept. And I think you see that in the Parisian case. Once the government is allowed to aggregate individual misdemeanors into one to reach a felony conviction, you by definition are saying that if any one particular one wasn't enough, by aggregating it, you get to the felony. But the difference here is that you have three separate thefts that the government emphasized both in the accounting and in the argument. Well, I think respectfully, Your Honor, if you look at the entire argument, the government always referred to it as one theft. They did talk about three separate takings, and those four words are used a lot. Separate takings are used a lot, yes. You're right. But I think that the government's argument was consistent. And, in fact, I think that if you look at the first superseding indictment, the government talks about the theft occurring over two days, you know, beginning on March 23rd and continuing to March 24th. I understand that defense might say that, well, there's some insufficiencies with the first superseding indictment, but keep in mind the first superseding indictment was never challenged.  It's hard to see exactly how it's a common plan or scheme when she goes home, at least in between some of these thefts, right? She does, Your Honor. So you show up for work, you take one, then you take two, then you go home and then you come back and then you have a third. Why isn't that, each of those just a separate occasion of if the opportunity presents itself, I'll take a little money? I think if you keep in mind the total facts. The facts are that she worked at the bank less than a week. She started on a Monday. By Wednesday of that week, she was in the cash vault. She was in the cash vault Wednesday and Thursday, and she quit Friday morning. I think that if you look at all the facts as they come in, the fact that it's under a 24-hour period that she does the three takings, the fact that she follows the same pattern and the same modus operandi every time, I think that she would have approximately $72,000. I don't think this was, and the fact that as she's counting, she is, as even came into evidence, two hours before her taking, she's segregating $100 bills into her pile. So this is not a situation where she just reaches into a bag of money and, you know, shoves it in her shirt. This is a situation where she's maximizing her potential. She's maximizing her ill-gotten gains. She's making sure she's got the hundreds and the high bills. How does that, that might work for the ones that she did on the same day, but it doesn't really calculate what she did the second day. Well, I think that you see the same pattern and the same scheme on the second day and on that third takings. And I think that you see her employ the same techniques. The fact that she's also, evidence came in that she's destroying documents over this period. She's doing everything to maximize her gain and to make it as impossible to trace as fine. And then as soon as the investigation starts, she quits. So, but I also want to go back to one of the biggest issues, because it's really just brushed on in Billingsley, Parisian, and Papua. And that's the temporal and geographic proximity. Because in those situations, they were willing to aggregate. In Billingsley, it was over several months. In Parisian, it was over eight months. And in Papua, it was over almost a year. Counsel, I'd like you to also talk about the Richardson case, if you would, and distinguish this case from Richardson, if you can. To the extent that I think when you're dealing with, well, let me, I just want to conclude on that point, that I think the geographic and the temporal proximity strongly support in this situation that it was a common scheme. I think that when you're looking at Nivens, Richardson, and some of those other cases that are talking about, they're not really dealing with aggregation. They're dealing with some other issues that pop up. For example, trying to go outside the statute of limitations or trying to go into a pre-guidelines and a post-guidelines analysis. None of those issues, none of those fairness issues, what you might call equity issues, are present in this case. Well, in Richardson, they had to prove a continuing criminal enterprise, but required that they prove the separate incidents separately. And have the jury find on them. How is that different from this case? Well, Your Honor, I don't think that the underlying equity issues are in the continuing criminal enterprise. I think that there are specific reasons why you'd want to prove, based on those facts in Richardson, which, keep in mind, all of the cases tell us these are very fact-specific issues. I think that those facts, there are equity reasons why you'd want to prove it. I don't think here, where it is so clearly part of one common plan, I just don't think that you need to get to the... The Supreme Court didn't talk about it in terms of equity. They said the jury must find the three violations separately and make a finding on them. I'm sorry, Your Honor, I didn't... They had to make a finding on each of the three criminal acts. Yes, Your Honor, but I do think that there are just factual differences that distinguish that in terms of the underlying crime. When you have a conspiracy charge, this instruction reads, with all of you agreeing on a particular overt act that took place, why doesn't there need to be some instruction here that all of you need to agree that a theft occurred at a particular time? Well, I think that there is a special jury finding that says all of you need to agree that the aggregated thefts were over $1,000. And I think that satisfies the concerns that would be addressed by such an instruction, so that the jury is agreeing that she has met the elements of the crime. But what the jury is doing is able to take all three of her actions and aggregate them into one theft, which is, in fact, what it was in this case. Even though they may disagree on which theft took place or which taking took place? Yes, Your Honor. I think you have to, if you, to accept the government's argument, you have to be willing to take that step, which is that, yes, three could agree on that it was the first one, three could agree a second, and six on the third. Separately, if the Court were inclined to disagree, I did want to address the harmless error analysis, because I think that, as the Court noted, that even if the Court did disagree with the government that aggregation was not proper in this case, I think that there is an overabundance of evidence that it was harmless error not to give the unanimity instruction in this case. And that is really what we're dealing with, the harmless error with regards to unanimity instruction. Leaving aside the video evidence, leaving aside the photographic evidence, I want to highlight that there was the testimony of Pat Rivera, and the defense refers to that in its papers as argument. That's not argument, that was evidence. She was the only person who viewed all 48 hours of the relevant videotape from the nine different camera angles. She talked about that this was the only person she observed not following prepping procedures, destroying documents, segregating cash, and then sticking her hands beneath the counter and stealing it. She talked about how there were $100 being segregated. And respectfully, if you look to her rebuttal, I think the government cleared up any misconception. She makes it very clear that this pattern was followed for all three thefts, not just the first one. And if you look at her rebuttal around government's excerpt of Record 157, you'll see that she makes it clear that it was the same pattern and that she observed this throughout the videotape. So her evidence comes in, I think, that even from watching the videotape and the amount of times that she's putting $100 bills on the pile, I think you clearly get that it's harmless error that the defendant clearly established, clearly stole over 70, around $70,000 over the 24-hour period. If there are no further questions. Thank you. I may have a minute for rebuttal. Personally, Your Honor, I don't think Pat Rivera, the bank investor's conclusory opinions about the videotape gets a lot of weight when the rest of the videotape was made to the juror. I mean, she was a witness who was on a side in the case. It's interesting that Mr. Monteiro just referred to, quote, her rebuttal, unquote. So I think the real evidence that it comes down to here is the videotape, and the fact that the videotape was made to the juror. I think that's a very good point. I think that's a very good point. I think that's a very good point. I think that's a very good point. And I just think that's a very good point.  I think Your Honor's analogy of the conspiracy situation is a very good one. Jurors, even though there's a single conspiracy, still have to agree on an overt act. It's certainly troubling to have someone convicted of a felony crime when you might have four jurors thinking it might be four to eight, a minority even, on each separate taking. And I'm not sure you could even have it then, but I don't think this Court needs to reach that question because at the very least there need be the jury finding of the preexisting common intent. And I think Judge Fletcher's point about the Richardson case and there's the Niven case that I cite in my reply brief, I'm not sure that the Ninth Circuit even allows a focus on actual facts as opposed to the structure of the statute. The statute here refers to a taking. It may not use that exact words, but it uses the sort of classic common law words of conversion and theft and so on. Thank you. Thank you, Your Honor. Thank you both for your arguments this morning. The case of United States v. Webster is submitted.
judges: B. Fletcher, McKeown, Whyte